Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Steven T. Henesy, Esq.
Allison N. Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                                Plaintiffs,

              -against-

COLIN CLARKE, M.D., COLIN CLARKE MD P.C.,
SVETLANA KOVALEVA a/k/a MELANA KAY,
MEDICAL EVALUATION SERVICES & BILLING,
INC., MEDICAL CONSULTATION SERVICES &
BILLING, INC., and JOHN DOE DEFENDANTS
"1"-"10,"

                                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiffs Demand a Trial
by Jury**

## COMPLAINT

      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Colin Clarke, M.D., Colin Clarke MD

P.C., Svetlana Kovaleva a/k/a Melana Kay, Medical Evaluation Services & Billing, Inc., Medical

Consultation Services & Billing, Inc., and John Doe Defendants 1-10 (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $3,000,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, excessive, illusory, and otherwise non-reimbursable healthcare services, including sham patient examinations, trigger point injections with attendant ultrasound guidance, and putative "prolonged services" (collectively, the "Fraudulent Services"). The Fraudulent Services allegedly were provided to New York automobile accident victims insured by GEICO ("Insureds") through Defendant Colin Clarke MD P.C. ("Clarke PC") and the personal tax identification number of Defendant Colin Clarke, M.D. (the "Clarke Practice").

2.      Defendant Clarke is a physician licensed to practice in New York who falsely posed as the purported owner of Clarke PC and the Clarke Practice (together, the "Clarke Billing Providers"). Clarke was nothing more than a nominal owner who, at all relevant times, was never the real owner, controller, or operator of the Clarke Billing Providers. In reality, Clarke served to conceal the unlawful ownership, control, and/or operation of the Clarke Billing Providers and the provision of the Fraudulent Services by Defendants Svetlana Kovaleva a/k/a Melana Kay ("Kay"), Medical Evaluation Services & Billing, Inc. ("MESB"), Medical Consultation Services & Billing, Inc. ("MCSB") ("MESB" and "MCSB", collectively, the "Kay Entities") and John Doe Defendants 1-10.

3.      The Defendants perpetrated the fraudulent scheme using illegal referral and kickback arrangements that permitted the Defendants to access a steady stream of automobile

accident victims, fraudulently bill GEICO for millions of dollars of Fraudulent Services and exploit Insureds for financial gain without regard to genuine patient care.

4.     GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,000,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Clarke Billing Providers because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the billing codes used to seek reimbursement for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)   the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons and through the use of illegal kickback arrangements;

(iv)    the Fraudulent Services were provided – to the extent provided at all – by independent contractors rather than by employees of the Clarke Billing Providers; and

(v)     the Clarke Billing Providers were unlawfully owned, operated, and/or controlled by unlicensed laypersons.

5.     The Defendants fall into the following categories:

(i)     Defendant Clarke is a physician licensed to practice medicine in the State of New York, who falsely purported to own, control, and operate the Clarke Billing Providers, and who purported to perform some of the Fraudulent Services;

(ii)    Defendant Clarke PC is a New York professional corporation through which the Fraudulent Services allegedly were provided and billed to insurance companies, including GEICO;

(iii)   Defendants Kay, MESB, MCSB and John Doe Defendants "1"-"5" (collectively, the "Management Defendants") are individuals and entities who secretly owned, operated, and/or controlled the Clarke Billing

Providers in violation of New York law, but who were never licensed healthcare professionals or entities; and

(iv)    John Doe Defendants "6"-"10" ("John Doe Defendants") are individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the Clarke Billing Providers, the provision of medically unnecessary services, "brokering" or "controlling" access to patients in exchange for illegal kickback payments, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.    As discussed herein, the Defendants at all relevant times have known that:

(i)    the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the billing codes used to seek reimbursement for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons and through the use of illegal kickback arrangements;

(iv)    the Fraudulent Services were provided – to the extent provided at all – by independent contractors rather than by employees of the Clarke Billing Providers; and

(v)    the Clarke Billing Providers were unlawfully owned, operated, and/or controlled by unlicensed laypersons.

7.    As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed to GEICO.

8.    The chart annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to-date that Defendants submitted, or caused to be submitted, to GEICO through the Clarke Billing Providers.

9.     The Defendants' fraudulent scheme began as early as 2016 and has continued uninterrupted through the present day, as the Clarke Billing Providers continue to seek collection on pending charges for the Fraudulent Services.

10.     As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $3,000,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.     Defendant Clarke resides in and is a citizen of New York. Clarke became licensed to practice medicine in New York on September 11, 1997. Clarke is the nominal owner of the Clarke Billing Providers and is falsely listed on virtually all of the Clarke Billing Providers' billing as the "Treating Provider" who rendered the Fraudulent Services.

13.     Clarke has a documented history of professional misconduct that resulted in significant discipline and restrictions on his medical license. On October 14, 2009, pursuant to a Consent Agreement and Order by the New York State Department of Health State Board for Professional Medical Conduct (the "Consent Agreement and Order"), Clarke's medical license was suspended pursuant to N.Y. Pub. Health Law Section 230-a for a period of thirty-six months, with the period of thirty-six months stayed.

14.     The disciplinary proceedings against Clarke were based on, among other things, allegations that Clarke deviated from acceptable standards of care by failing to adequately supervise the performance of patient examinations and electrodiagnostic testing by unlicensed members of his staff.

15.     Pursuant to the Consent Agreement and Order, Clarke was ordered to "refrain from ordering, performing and/or interpreting electrodiagnostic nerve and muscle studies from [the Consent Order's] effective date and continuing as long as [Clarke] remains a licensee in New York State".

16.     The Consent Agreement and Order further stated that Clarke "shall refrain from forming, owning, controlling or practicing under the auspices of any more than one professional corporation at any given point in time from [the Consent Order's] effective date and continuing as long as [Clarke] remains a licensee in New York State".

17.     Upon information and belief, Clarke's documented history of professional misconduct and public discipline by the New York State Department of Health – which can be located using a simple internet search by potential employers, referral sources, health insurers, and patients – coupled with the stringent restrictions on his ability to practice medicine, have made it virtually impossible for Clarke to obtain and maintain sufficiently-remunerative employment, and contributed to his motive to participate in the fraudulent scheme outlined in this Complaint.

18.     Defendant Clarke PC is a New York professional corporation incorporated on or about July 18, 2000, with its principal place of business in New York.

19.     Defendant Kay resides in and is a citizen of New York. Kay is a non-physician who, along with the other Management Defendants, at all relevant times, secretly and unlawfully owned, operated, and/or controlled the Clarke Billing Providers. Kay and the other Management

Defendants exercised unlawful ownership and control over the Clarke Billing Providers to siphon profits from the Clarke Billing Providers to herself and others.

20.     Defendant MESB is a New York corporation with its principal place of business in New York and was incorporated on or about December 4, 2014. MESB was owned and controlled by Kay and was used by Kay and the other Management Defendants to facilitate the Management Defendants' ownership and control of the Clarke Billing Providers.

21.     Defendant MCSB is a New York corporation with its principal place of business in New York and was incorporated on or about March 19, 2018. MCSB was owned and controlled by Kay and was used by Kay and the other Management Defendants to facilitate the Management Defendants' ownership and control of the Clarke Billing Providers.

22.     John Doe Defendants 1-10 reside in and are citizens of New York. John Doe Defendants 1-10 are individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the Clarke Billing Providers and the provision of medically unnecessary services, "brokering" or "controlling" access to patients in exchange for illegal kickback payments, and/or spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

24.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"]

Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

26.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement**

27.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

28.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

29.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

30.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of

Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

31.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

32.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

33.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

35.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

36.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

37.      Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

38.      In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that health care providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and/or local laws.

39.      In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

40.      Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

41.      Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill

for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

42.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

43.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

44.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     Overview of the Scheme

45.     Beginning in 2016 and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which the Clarke Billing Providers were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, excessive, illusory, and/or otherwise non-reimbursable healthcare services.

**B.    The Fraudulent Operation of the Clarke Billing Providers**

46.    In or around 2016, Clarke entered into a secret agreement with the Management Defendants whereby he agreed to cede all true ownership and control over the Clarke Billing Providers to the Management Defendants.

47.    Pursuant to Clarke's arrangement with the Management Defendants, he would falsely pose as the Clarke Billing Providers' sole owner and treating provider. Clarke entered into this agreement knowing that the Clarke Billing Providers would be used as vehicles to submit fraudulent no-fault insurance billing to GEICO and other insurance companies.

48.    In particular, Clarke ceded all significant decision-making and oversight regarding healthcare services purportedly rendered by the Clarke Billing Providers to the Management Defendants, who used the façade of the Clarke Billing Providers to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

49.    Clarke never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the Clarke Billing Providers' financial affairs; never hired or supervised any of the Clarke Billing Providers' employees or independent contractors; and was never aware of fundamental aspects of how the Clarke Billing Providers operated for the duration of the Fraudulent Scheme.

50.    The Management Defendants maintained control over the Clarke Billing Providers through a series of financial and kickback agreements/arrangements that involved, among other things: (i) leasing of the physical space; (ii) obtaining and causing the medical practice to cause referrals/prescriptions to be issued for, among other things, durable medical equipment, pharmaceuticals, physical therapy, chiropractic services and acupuncture, all of which were

medically unnecessary, to the extent they were provided at all; and (iii) causing the practice to enter into arrangements with companies tied to the Management Defendants, resulting in payments from the Clarke Billing Providers to, among others, MESB and MCSB.

51. While these agreements and arrangements ostensibly were created to permit the Management Defendants to provide services, or facility space and equipment, they were actually used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Clarke Billing Providers; and (ii) to siphon the profits that were generated by the billings submitted to GEICO and other insurers through the Clarke Billing Providers.

52. For example, between October 2018 and July 2022, the Management Defendants caused the Clarke Billing Providers to issue more than $1,100,000.00 in payments to MESB and MCSB.

53. In keeping with the fact that the payments issued from the Clarke Billing Providers to MESB and MCSB were not for legitimate services – and rather were a means by which the Management Defendants extracted funds out of the Clarke Billing Providers for their own gain – Clarke claimed during a 2023 examination under oath that the only justification for the payments to companies associated with Kay was for "billing services".

54. No legitimate billing service for a medical practice of comparable size to the Clarke Billing Providers would cost more than $1,100,000.00.

55. In keeping with the fact that the payments from the Clarke Billing Providers to MCSB and MESB were not for billing services – and instead were a means by which the Management Defendants siphoned the profits out of the Clarke Billing Providers – the minimal supposed "services" provided by Kay, MCSB, and MESB to the Clarke Billing Providers – to the

extent they provided any legitimate services at all – would not take more than one hour per day. Even so, the Defendants caused the Clarke Billing Providers to pay Kay, MSCB, and MESB tens of thousands of dollars a month (and sometimes, in just a week or several days) for these supposed "services".

56.     In reality, the payments from the Clarke Billing Providers to MESB and MCSB were simply one of the means by which the Management Defendants funneled revenue out of the Clarke Billing Providers for their own pecuniary benefit.

57.     The Defendants were aware that their financial arrangements, if revealed, could impair their ability to continue to submit and collect on fraudulent no-fault insurance billing.

58.     Therefore, the Defendants took steps to conceal the true nature of their financial arrangements and – by extension – the Management Defendants' secret and unlawful control over the Clarke Billing Providers.

59.     For instance, the Defendants would often cause multiple checks to be issued on a single day or in close succession to another, payable to either MESB or MCSB, in order to conceal the true amounts of the payments.

60.     For example:

(i)     On March 21, 2018, the Defendants caused two checks to be issued by the Clarke Billing Providers to MESB, one for $6,000.00 and another for $9,000.00, for a total of $15,000.00 in a single day.

(ii)    On April 11, 2018, the Defendants caused two checks to be issued by the Clarke Billing Providers to MESB, each in the amount of $3,000.00. Then, one week later, on April 18, 2018, the Defendants caused two more checks to be issued by the Clarke Billing Providers to MESB, one for $3,000.00 and one for $6,000.00. In total, the Defendants caused four separate checks to be issued by the Clarke Billing Providers to MESB over the span of just one week, for a total amount of $15,000.00.

(iii)   On May 2, 2018, the Defendants caused two checks to be issued by the Clarke Billing Providers to MESB, each in the amount of $3,000.00. The

next day, May 3, 2018, the Defendants caused two more checks to be issued by the Clarke Billing Providers to MESB, one for $6,000.00 and another for $3,000.00. Then, six days later, on May 9, 2018, the Defendants caused two more checks to be issued by the Clarke Billing Providers to MESB, both for $3,000.00. In total, the Defendants caused six separate checks to be issued by the Clarke Billing Providers to MESB over the span of just one week, for a total amount of $21,000.00.

(iv)    On April 10, 2018, the Defendants caused two checks to be issued by the Clarke Billing Providers to MESB, one for $12,000.00 and another for $9,000.00, for a total of $21,000.00 in a single day.

(v)    On November 5, 2018, the Defendants caused two checks to be issued by the Clarke Billing Providers to MCSB, each in the amount of $9,000.00. Then, just nine days later, on November 14, 2018, the Defendants caused two more checks to be issued by Clarke PC to MCSB, each in the amount of $3,000.00. In total, the Defendants caysed four separate checks to be issued by the Clarke Billing Providers to MCSB over the span of just nine days, for a total of amount of $24,000.00.

61.    In keeping with the fact that the Clarke Billing Providers were, at all relevant times, truly owned and controlled by the Management Defendants, Clarke permitted the Management Defendants access to the following facsimile electronic version of his signature:


Colin Clarke, M.D.

62.    In keeping with the fact that the Management Defendants had access to Clarke's electronic signature, it was Kay, MCSB, and MESB's regular pattern and practice to possess electronic signatures or electronic signatures for the medical practices for which they purported to provide "services", including entities called Queens Medical Diagnostic, P.C. and Avenue Medical Care, P.C.

63.    Using Clarke's electronic signature, the Defendants caused the Clarke Billing Providers to: (i) submit fraudulent or otherwise noncompensable billing to GEICO and other insurers; and (ii) cause Insureds to be referred to the following entities/individuals:

- Anna Adeeb Rehab PT, P.C., Basem Care PT, P.C., and Nara PT. Chiro. & Acu., PLLC for physical therapy services;

- MED Equipments Services, Inc., Dakiroks Products Corp., Needful Goods Corp., Exon Medical Equipment, Inc., Veradakir Medical Products Corp. and Alta Life Medical Equipment, Inc., for durable medical equipment ("DME");

- M&D Elite Pharmacy, LLC, Sherman Pharmacy 2, Inc., Turnpike Meds RX, Inc., TMVQS Corp. d/b/a Trinity Pharmacy, and AHI Pharmacy, Inc. for pharmaceutical products; and

- Sky Radiology, P.C., Cliffside Park Imaging & Diagnostic Center, Medaid Radiology, and Atlas Radiology, P.C. for MRI imaging services.

64.    The net effect of the agreements and financial arrangements between the Defendants enabled the Management Defendants to maintain control over the Clarke Billing Providers, their accounts receivable, and any revenues that might be generated therefrom.

65.    The Management Defendants' unlawful ownership and control of the Clarke Billing Providers compromised patient care, because the provision of health services through the Clarke Billing Providers was subject to the pecuniary interests of its non-medical professional owners, not the independent medical judgment of a true medical professional-owner.

**D.    The Defendants' Unlawful Kickback and Referral Arrangements**

**1.    USA v. Rose and the Lafayette Avenue Clinic**

66.    In 2019, in a case entitled United States of America v. Rose, S.D.N.Y. Case No. 1:19-cr-00789-PGG, 27 individuals – including five 911 operators and a uniformed police officer employed by the New York City Police Department  – were indicted and arrested in connection with a multimillion-dollar insurance fraud scheme.

67.    The USA v. Rose indictment outlined a massive scheme in which the Rose defendants bribed 911 operators, medical personnel, and police officers for the confidential information of tens of thousands of motor vehicle accident victims.  Using this information,

various of the Rose defendants contacted victims, lied to them, and steered them to clinics and lawyers handpicked by various of the Rose defendants. These clinics and lawyers then paid various of the Rose defendants kickbacks for these referrals, which were distributed to co-conspirators as payments and bribes.

68. The scheme outlined in the Rose indictment was notable for its breadth and for its sophistication. The Rose defendants were alleged to have bribed as many as 50 people – including individuals working for hospitals and law enforcement – who were paid as much as $4,000.00 per month for "leads" for automobile accident victims.

69. Armed with these "leads", the Rose defendants set up a "call center", staffed with between 10 to 15 "employees" who contacted the accident victims on a daily basis and steered them to seek medical treatment at the clinics and law firms who had paid the Rose defendants kickbacks.

70. All told, the Rose defendants made more than 60,000 phone calls to their paid-for "leads", and steered as many as 6,000 automobile accident victims to the clinics and law firms who had paid the Rose defendants kickbacks.

71. All 27 defendants in the Rose case pleaded guilty to at least one criminal charge against them.

72. Among the clinic locations to which the Rose defendants steered automobile accident victims in exchange for kickbacks was the clinic located at 488 Lafayette Avenue, Brooklyn, New York (the "Lafayette Avenue Clinic").

73. As part of their fraudulent scheme, Clarke, the Clarke Billing Providers, and the Management Defendants purported to "treat" more than 200 individual GEICO Insureds at the Lafayette Avenue Clinic. Those "services" at the Lafayette Avenue Clinic resulted in more than

2,000 separate charges being submitted by the Defendants to GEICO, seeking reimbursement of more than $300,000.00.

74.     As outlined below, Clarke, the Clarke Billing Providers, and the Management Defendants paid or caused to be paid kickbacks in exchange for patient referrals at the Lafayette Avenue Clinic, as well as at a series of other purported "healthcare" clinics in Brooklyn, Queens, and Bronx.

### 2.     The Unlawful Kickback and Referral Scheme

75.     Clarke, the Clarke Billing Providers, and the Management Defendants did not operate the Clarke Billing Providers from any single, fixed, location.

76.     Instead, Clarke, the Clarke Billing Providers, and the Management Defendants operated the Clarke Billing Providers on an itinerant basis from various "No-Fault" medical clinics, primarily located in Queens, Bronx and Brooklyn.

77.     As a result of illegal kickback and referral arrangements, Clarke, the Clarke Billing Providers and the Management Defendants accessed patients and allegedly provided Fraudulent Services from the following No-Fault medical clinic locations, where the Clarke Billing Providers received steady volumes of patients through no legitimate efforts of their own, including at the following clinics (collectively, the "Clinics"):

- 221-05 Jamaica Avenue, Queens Village, New York;

- 3702 92nd Street, Jackson Heights, New York;

- 2598 3rd Avenue, Bronx, New York;

- 214-29 Jamaica Avenue, Queens Village, New York;

- 560 Prospect Avenue, Bronx, New York;

- 900B East Tremont Avenue, Bronx, New York;

- 142-18 38th Avenue, Flushing, New York;

- 488 Lafayette Avenue, Brooklyn, New York; and

- 164-10 Crocheron Avenue, Flushing, New York.

78.    Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, virtually all of the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

79.    At many of the Clinics, unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base, and dictated fraudulent protocols used to maximize profits without regard to actual patient care.

80.    The Clinics provided facilities for the Defendants, as well as a "revolving door" of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

81.    In fact, at many of the Clinics, GEICO received billing from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

82.    For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 560 Prospect Avenue, Bronx, from a revolving door of more than <u>70</u> purportedly different healthcare providers.

83.    Similarly, GEICO received billing for purported healthcare services rendered at the Clinics located at: (i) 2598 3rd Avenue, Bronx, from more than 65 purportedly different healthcare providers; (ii) 488 Lafayette Avenue, Brooklyn, from more than 50 purportedly different healthcare providers; and (iii) 3702 92nd Street, Jackson Heights, from more than 40 purportedly different healthcare providers.

84.    The Clinics did not advertise themselves to the public as having been affiliated with any one healthcare provider. Instead, the Clinics often featured signage indicating only that it was a "medical office" and that services of healthcare "services" were offered there.

85.    For example, the following is a photograph of the outside of the Clinic located at 900B East Tremont Avenue in the Bronx:



86.    Along similar lines, the following is a photograph of the outside of a Clinic located at 560 Prospect Avenue in the Bronx:



87.     The Clinics willingly provided access to Clarke, the Clarke Billing Providers and the Management Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

88.     In general, Clarke, the Clarke Billing Providers and the Management Defendants paid the referral sources at the Clinics through payments typically disguised as "rent". They were in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

89.     In order to obtain access to the Clinics' patient base (i.e., Insureds), Clarke, the Clarke Billing Providers and the Management Defendants entered into illegal kickback and referral arrangements with unlicensed persons and/or healthcare professionals, including the John Doe Defendants, who "brokered" or "controlled" access to patients treated, or purported to be treated, at the Clinics.

90.     Neither Clarke nor any other healthcare professional purportedly associated with the Clarke Billing Providers had their own patients at the Clinics and did anything to create a patient base.

91.     Clarke, the Clarke Billing Providers and the Management Defendants did not market the existence of the Clarke Billing Providers or the Fraudulent Services to the general public.

92.     Clarke, the Clarke Billing Providers and the Management Defendants did not advertise for patients, did not maintain any website, and never sought to build name recognition or make any legitimate efforts of his own to attract patients on behalf of the Clarke Billing Providers.

93.     Clarke did not do virtually anything that would be expected of the owner of a legitimate medical professional corporation to develop its reputation and attract patients to the Clinics or to the Clarke Billing Providers.

94.     As Clarke, the Clarke Billing Providers, and the Management Defendants did not have any patients of their own at the Clinics and the healthcare services that they could provide to the patients at the Clinics were limited and dictated by the unlicensed laypersons and/or healthcare professionals, including the John Doe Defendants, who controlled access to patients at the Clinics and were interested only in maximizing profits without regard to genuine patient care.

95.     At bottom, neither Clarke nor any other medical professional that may have rendered services under the name of the Clarke at the Clinics had a genuine doctor-patient relationship with the Insureds that visited the Clinics, as the Insureds had no scheduled appointments with Clarke or the Clarke Billing Providers specifically.

96.     In fact, the Insureds were simply directed by the Clinics, and the unlicensed laypersons and/or healthcare professionals associated therewith, to subject themselves to treatment by whatever individual was working on behalf of Clarke PC and the other medical providers on that given day, because of the illegal kickbacks paid by the Clarke, the Clarke Billing Providers, and the Management Defendants.

**E.      The Defendants' Fraudulent Treatment and Billing Protocol**

97.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, Clarke, the Clarke Billing Providers and the Management Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

98.     Each step in the fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

99.     The fraudulent treatment and billing protocol resulted in millions of dollars in billing to GEICO for medically unnecessary, excessive, illusory, and/or bogus services, including patient examinations, "prolonged services", and trigger point injections under ultrasound guidance. (*i.e*., the "Fraudulent Services").

100.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

101.     Moreover, the fraudulent treatment and billing protocol described below was permitted to proceed because the Clarke Billing Providers and the Fraudulent Services were, at all relevant times, controlled and dictated by the Management Defendants, rather than by any licensed physician.

### 1.     The Fraudulent Charges for Initial Consultations

102.     Upon receiving a referral pursuant to the kickbacks that the Management Defendants, the Clarke Billing Providers, and Clarke paid to the unlicensed laypersons and/or healthcare professionals associated with the Clinics, including John Doe Defendants "6"-"10", the Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1" and "2" with an initial consultation.

103.     In keeping with the fact that the initial consultations were performed pursuant to the kickbacks that the Management Defendants, the Clarke Billing Providers, and Clarke paid at the Clinics, the Clarke Billing Providers virtually always purported to perform the initial consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

104.     The initial consultations were performed as a "gateway" in order to provide a false basis to justify the Defendants' exploitation of the Insureds through: (i) the Clarke Billing Providers' medically unnecessary, excessive, illusory, and/or bogus services; and (ii) a laundry-

list of prescriptions for various other putative goods and services – including physical therapy, durable medical equipment, pharmaceuticals, and other medically unnecessary/illusory medical services – that were supposedly generated and prescribed personally by Clarke, but were actually generated by the Management Defendants.

105.    As set forth in Exhibits "1" and "2", the Management Defendants, the Clarke Billing Providers, and Clarke then typically billed the examinations and consultations through the Clarke Billing Providers using CPT code 99244, virtually always resulting in a charge of $324.69 for each purported consultation.

106.    All of the Defendants' billing for initial consultations represented that the consultations had been personally performed by Clarke.

107.    The charges for the initial consultations were fraudulent in that the consultations were medically unnecessary and were performed – to the extent performed at all – pursuant to the kickbacks that the Management Defendants, the Clarke Billing Providers, and Clarke paid at the Clinics in coordination with the John Doe Defendants, not to treat or otherwise benefit the Insureds.

108.    Furthermore, the Clarke Billing Providers' charges for the initial consultations were fraudulent in that they misrepresented the nature and extent of the initial consultations.

109.    For example, in the claims for initial consultations identified in Exhibits "1" and "2", the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

110.    The use of CPT code 99244 typically required that a healthcare professional spend 60 minutes of face-to-face time with the Insured or the Insured's family.

111.    Though the Management Defendants, the Clarke Billing Providers, and Clarke billed their initial consultations under CPT codes 99244, no healthcare professional associated with the Clarke Billing Providers spent 60 minutes on an initial consultation.

112.    Rather the initial consultations in the claims identified in Exhibits "1" and "2" rarely lasted more than 10 to 15 minutes.

113.    In keeping with the fact that the initial consultations rarely lasted more than 10 to 15 minutes, the Clarke Billing Providers' purported initial consultations were documented using template forms.

114.    The template forms the Clarke Billing Providers used in conducting the initial consultations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

115.    All that was required to complete templated forms was a brief patient interview and a perfunctory physical examination of the Insureds.

116.    These putative interviews and examinations did not require any healthcare professional associated with the Clarke Billing Providers to spend more than 10 to 15 minutes of face-to-face time with the Insureds during the putative consultations.

117.    Pursuant to the Fee Schedule, the Management Defendants, the Clarke Billing Providers, and Clarke submitted charges for initial consultations under CPT code 99244, or caused them to be submitted, they also falsely represented that an associated healthcare professional: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

### a.    Misrepresentations Regarding the Performance of Consultations

118.    Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

119.    However, the Clarke Billing Providers did not provide its purported "consultations" – to the extent that they are provided at all – pursuant to a legitimate referral from any other physician or other appropriate source. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed as a result of the illegal kickback payments and pursuant to the Defendants' fraudulent treatment protocol in order to generate billing to be submitted through the Clarke Billing Providers.

120.    In keeping with the fact that the Management Defendants, the Clarke Billing Providers, and Clarke did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

121.    Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

122.    However – and, again, in keeping with the fact that the Management Defendants, the Clarke Billing Providers, and Clarke did not provide their purported "consultations" at the request of another physician or appropriate source – neither Clarke nor any other healthcare

professional associated with the Clarke Billing Providers ever submitted any written consultation report to any referring physician or other healthcare provider.

123.    In the claims for purported "consultations" identified in Exhibits "1" and "2", the Management Defendants, the Clarke Billing Providers, and Clarke misrepresented the underlying services to be consultations billable under CPT code 99244 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

**b.    Misrepresentations Regarding "Comprehensive" and "Detailed" Patient Histories**

124.    Pursuant to the Fee Schedule, when the Management Defendants, the Clarke Billing Providers, and Clarke submitted charges for initial consultations through the Clarke Billing Providers under CPT code 99244, they represented that they took a "comprehensive" patient history.

125.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

126.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

127.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)    constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)    respiratory;

(vi)    gastrointestinal;

(vii)    genitourinary;

(viii)    musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)    neurological;

(xi)    psychiatric;

(xii)    endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)    allergic/immunologic.

128.    When the Management Defendants, the Clarke Billing Providers, and Clarke billed for the initial consultations under CPT code 99244 through the Clarke Billing Providers, they falsely represented that Clarke took a "comprehensive" patient history from the Insureds they purported to treat during the initial consultations.

129.    In fact, no healthcare professional associated with the Clarke Billing Providers ever took a legitimate "comprehensive" patient history from the Insureds they purported to treat during the initial consultations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

130.    Furthermore, pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

Case 1:23-cv-04605-FB-PK    Document 1    Filed 06/21/23    Page 30 of 68 PageID #: 30


131.    However, no healthcare professional associated with the Clarke Billing Providers ever took a "detailed" patient history from Insureds during its initial consultations, inasmuch as they did not review systems related to the patients' presenting problems and did not conduct any review of a limited number of additional systems.

132.    Rather, after purporting to provide the initial consultations, the Management Defendants, the Clarke Billing Providers, and Clarke simply prepared reports containing ersatz patient histories in order to justify the performance of the Fraudulent Services.

133.    These patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; (ii) the Clarke Billing Providers' billing to GEICO, and other insurers, for the Fraudulent Services that they purported to provide; and (iii) the laundry-list of other purported goods and services prescribed to Insureds at the conclusion of the putative consultations.

### c.    Misrepresentations Regarding "Comprehensive," "Detailed," and "Problem Focused" Physical Examinations

134.    Pursuant to the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

135.    Further, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

136.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

137.    When the Management Defendants, the Clarke Billing Providers, and Clarke billed for the initial consultations through the Clarke Billing Providers under CPT code 99244, they falsely represented that Clarke performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial consultations.

138.    In fact, no healthcare professional associated with the Clarke Billing Providers ever conducted a general examination of multiple patient organ systems or conduct a complete examination of a single patient organ system.

139.    For instance, no healthcare professional associated with the Clarke Billing Providers ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

140.    Furthermore, although the Clarke Billing Providers often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial consultations, the musculoskeletal examinations did not qualify as "complete," because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

141.    Similarly, when the Management Defendants, the Clarke Billing Providers, and Clarke submitted charges for initial consultations under CPT code 99244 through the Clarke Billing Providers, Clarke represented that they engaged in medical decision-making of "moderate complexity."

142.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

143.    Though the Management Defendants, the Clarke Billing Providers, and Clarke routinely falsely represented that initial consultations involved medical decision-making of "moderate complexity", in actuality the initial consultations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with injuries or symptoms with any degree of complexity, the deficient initial consultations were incapable of assessing and/or diagnosing them as such.

144.    First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

145.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by initial examinations and

consultations – to the extent that the Management Defendants, the Clarke Billing Providers, and Clarke provided any such diagnostic procedures or treatment options in the first instance.

146.    In almost every instance, any diagnostic procedures and "treatments" that the Management Defendants, the Clarke Billing Providers, and Clarke actually provided or prescribed were limited to either a series of medically unnecessary trigger point injections, durable medical equipment, pharmaceuticals, and/or diagnostic tests or experimental and investigational "services", none of which were health or life-threatening if properly provided or administered.

147.    Second, the Management Defendants, the Clarke Billing Providers, and Clarke did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

148.    In fact, no healthcare professional associated with the Clarke Billing Providers engaged in any medical decision-making at all. Rather, the outcome of the initial consultations were pre-determined for virtually every Insured to result in boilerplate "diagnoses" that merely: (i) matched the patients' subjective complaints; and (ii) added diagnoses that would justify performance of the particular Defendants' fraudulent services as well as their purported prescriptions for other unnecessary goods and services.

149.    In keeping with the fact that the purported initial consultations did not involve any legitimate medical decision making at all, the putative initial consultation "reports" virtually always included the following identical treatment "plan" including physical therapy, acupuncture, chiropractic care and referrals to specialists – regardless of the individual circumstances, presentations, or needs of the individual Insureds:

```
Plan:            Physical therapy for treatment of injuries.
                 Acupuncture for treatment of injuries.
                 Chiropractic care for management of axial injuries.
                 Refer patient to orthopedist for evaluation and treatment.
                 Refer patient to neurologist for further evaluation.
```

150.    The Management Defendants, the Clarke Billing Providers, and Clarke's purported initial consultations did not involve any legitimate medical decision making at all, the results of the examinations were dictated by the Management Defendants, not Clarke or any other licensed physician.

151.    In sum, the initial consultations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the particular Fraudulent Services that the respective Defendants purported to perform and then billed to GEICO and other insurers.

### 2.    The Fraudulent Charges for Follow-Up Examinations

152.    In addition to their fraudulent initial examinations, the Management Defendants, the Clarke Billing Providers, and Clarke often purported to subject the Insureds in the claims identified in Exhibits "1" and "2" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

153.    The Management Defendants, the Clarke Billing Providers, and Clarke billed the follow-up examinations through the Clarke Billing Providers under CPT code 99214, most often resulting in a charge of $127.41.

154.    All of the billing submitted to GEICO by the Management Defendants, the Clarke Billing Providers, and Clarke for the putative follow-up examinations represented that each and every follow-up "exam" was performed by Clarke.

155.    Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically

unnecessary and were performed – to the extent they were performed at all – pursuant to the illegal kickback and financial arraignments, referral schemes and fraudulent treatment protocol.

156.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

157.    In keeping with the fact that the follow-up examinations were fraudulent, the purported "reports" generated by the Management Defendants, the Clarke Billing Providers, and Clarke in connection with the putative follow-up examinations virtually always: (i) merely reiterated the phony, pre-determined "diagnoses" provide by the Management Defendants, the Clarke Billing Providers, and Clarke at the conclusion of their initial consultations; (ii) recommending that the Insureds receive fraudulent and medically unnecessary trigger point injections through the Clarke Billing Providers; and (iii) directed the Insureds to continue receiving the laundry list of unnecessary services provided to them at the Clinics.

158.    For example, the Defendants provided the following substantially identical "directive" to virtually every Insured to whom the Defendants supposedly provided follow-up examinations:

```
Plan:          MRI left ankle for further evaluation.
               Physical therapy for treatment of injuries.
               Chiropractic care for management of axial injuries.
               Refer patient to orthopedist for evaluation and treatment.
               Refer patient to neurologist for further evaluation.
               Lidocaine ointment tid prn*
```

159.    In keeping with the fact that the results of the Defendants' follow-up examinations were predetermined, the Defendants provided this substantially identical treatment "plan" to virtually every Insured, regardless of each Insured's individual circumstances and presentations.

### 3. The Fraudulent Charges for Prolonged Services

160.    Pursuant to their fraudulent billing and treatment protocol, illegal kickback and financial arrangements, and referral scheme, the Management Defendants, the Clarke Billing Providers, and Clarke caused bills to be submitted through the Clarke Billing Providers to GEICO for "prolonged services w/o contact" on separate dates from which Clarke purportedly provided face-to-face service to Insureds.

161.    The Management Defendants, the Clarke Billing Providers, and Clarke then billed the "prolonged services" to GEICO though the Clarke Billing Providers using CPT code 99358, generally resulting in a charge of $280.12.  The following is a representative example:

| 15 REPORT OF SERVICES RENDERED - ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | |
|---|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | UN | FEE SCHEDULE TREATMENT CODE | CHARGES |
| | COLIN CLARKE, M.D.  3703 92 ST, JACKSON HTS, NY 11372-7929 | | | | |
| 03/02/2021 | | PROLONGED SERV, W/O CONTACT | 1 | 99358 | 280.12 |
| | | | | TOTAL CHARGES TO DATE $ | 280.12 |

162.    Using CPT code 99358, the Management Defendants, Clarke and the Clarke Billing Providers represented to GEICO, through paperwork attached to bills further discussed below, that Clarke provided one of the following services: (i) reviews of diagnostic imaging results, (ii) reviews of medical records based upon purported requests from Insureds for DME and/or medication, and (iii) reviews of medical records to purportedly determine the disability status of patients.

163.    Pursuant to the CPT Assistant, code 99358 is used "when a prolonged service is provided that is neither face-to-face time in outpatient, inpatient, or observation setting[.]".  The

CPT assistant further states that the service must be related to ongoing patient management and should only be used once per date of service.

164.    Specifically, CPT code 99358 represents the first hour of prolonged services provided by a provider without direct face-to-face conduct, which requires that a provider must spend a minimum of thirty (30) minutes providing prolonged services in order to be eligible for reimbursement under CPT code 99358.

165.    As part of the fraudulent scheme, and in order to ensure reimbursement for purported "prolonged services", the Management Defendants, Clarke and the Clarke Billing Providers falsely represented to GEICO that each of their purported "prolonged services" took 35 minutes to conduct.

166.    In reality, the purported "prolonged services" never took more than a few minutes, to the limited extent that they were performed at all.

167.    The following is a representative example of an "addendum" generated by Clarke, the Clarke Billing Providers, and the Management Defendants in connection with the supposed "prolonged services", which represents that these "services" took at least 35 minutes to conduct:

Colin Clarke, M.D.
164-10 Crocheron Avenue
Flushing, NY 11358

(212) 222-3535                                              Fax (212) 871-1011

DOB: ███████
DA:  5/27/2022
Associated DOS (if applicable): 7/12/2022
Addendum Time: 35 min.
Associated Areas:   right hip, cervical, thoracic, lumbar, left shoulder,
                    left foot/ankle
Addendum Date: 7/13/2022

                         ADDENDUM

Disability certification request received and reviewed.

Visit notes retrieved and reviewed. Diagnostic imaging results retrieved and
reviewed. Pharmacy profile retrieved and reviewed.

The patient continues to be disabled from work as described in the attached
documents.

See attached documents.

Colin Clarke, M.D.

168.    The Management Defendants, Clarke and the Clarke Billing Providers further submitted high volumes of charges for "prolonged services" on behalf of individual Insureds, often claiming that the purported "prolonged services" were performed on consecutive dates.

169.    For example, the Management Defendants, Clarke, Clarke Billing Providers routinely submitted billing on behalf of GEICO Insureds for 10 or more dates of purported "prolonged services" performed, and these "prolonged services" were often performed on consecutive dates. For example:

(i)      Clarke, the Clarke Billing Providers, and the Management Defendants submitted 16 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named JL;

(ii)     Clarke, the Clarke Billing Providers, and the Management Defendants submitted 19 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named LV;

(iii)    Clarke, the Clarke Billing Providers, and the Management Defendants submitted 16 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named LS;

(iv)    Clarke, the Clarke Billing Providers, and the Management Defendants submitted 10 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named CW;

(v)     Clarke, the Clarke Billing Providers, and the Management Defendants submitted 14 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named DC;

(vi)    Clarke, the Clarke Billing Providers, and the Management Defendants submitted 10 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named SS;

(vii)   Clarke, the Clarke Billing Providers, and the Management Defendants submitted 11 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named SG;

(viii)  Clarke, the Clarke Billing Providers, and the Management Defendants submitted 12 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named SG;

(ix)    Clarke, the Clarke Billing Providers, and the Management Defendants submitted 11 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named AG; and

(x)     Clarke, the Clarke Billing Providers, and the Management Defendants submitted 12 separate charges for "prolonged services" supposedly provided in connection with the "treatment' of an Insured named EH.

170.    These are only representative examples.

171.    Moreover, and in keeping with the fact that the Defendants' billing for "prolonged services" was fraudulent, Clarke, the Clarke Billing Providers, and the Management Defendants frequently numerous separate charges for "prolonged services" purportedly performed on a single date – including instances in which Clarke falsely purported to perform an impossible amount of "prolonged services" on just one day.

172.    For example:

(i)     The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 51 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on June 4, 2018. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely

represented that Clarke had performed <u>more than 29 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $14,286.12 for those supposed "services".

(ii)    The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 39 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on July 12, 2018. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed more than <u>22 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $10,924.68 for those supposed "services".

(iii)    The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 35 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on July 26, 2018. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>more than 20 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $9,804.20 for those supposed "services".

(iv)    The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 43 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on December 20, 2018. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>more than 25 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $12,045.16 for those supposed "services".

(v)    The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 36 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on May 18, 2019. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had <u>performed 21 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $10,084.32 for those supposed "services".

(vi)    The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 36 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on May 28, 2019. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>21 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $10,084.32 for those supposed "services".

(vii)    The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 58 separate "sessions" of

"prolonged services", each supposedly lasting 35 minutes on June 2, 2019. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>more than 33 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $16,246.96 for those supposed "services".

(viii)   The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 45 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on June 2, 2019. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>more than 26 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $12,605.40 for those supposed "services".

(ix)   The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 44 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on April 1, 2021. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>more than 25 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $12,325.28 for those supposed "services".

(x)   The Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed 47 separate "sessions" of "prolonged services", each supposedly lasting 35 minutes on November 4, 2021. All told, the Management Defendants, the Clarke Billing Providers, and Clarke falsely represented that Clarke had performed <u>more than 27 hours of "prolonged services" for GEICO Insureds in a single day</u>, and sought reimbursement of $13,165.64 for those supposed "services".

173.   These are only representative examples.

174.   In the claims identified in Exhibits "1" and "2", Management Defendants, the Clarke Billing Providers, and Clarke submitted billing to GEICO representing that Clarke had performed an impossible number of hours of supposed "prolonged services" for GEICO Insureds in a single day.

175.   In this context, it is important to emphasize that GEICO is only one of many automobile insurers in the New York automobile insurance market, and that the above examples relate only to GEICO Insureds.

176.    It is extremely unlikely – to the point of impossibility – that the Defendants only submitted their fraudulent "prolonged services" billing to GEICO and to no other automobile insurers.

177.    Therefore, upon information and belief, the billing submitted by the Defendants to GEICO for an impossible amount of "prolonged services" in a single day represented only a portion of the total number of hours of "prolonged services" purportedly provided by the Defendants in just one day.

178.    Moreover, the Defendants frequently submitted billing for the "prolonged services" to GEICO in close temporal proximity to their supposed patient examinations – during which Clarke and the Clarke Billing Providers would have had ample opportunity to conduct the supposed "analysis" they purported to conduct – separately – as part of their putative "prolonged services".

179.    In reality, the Defendants submitted the billing for the "prolonged services" to GEICO in order to maximize the amount of fraudulent billing they could submit to GEICO and other insurers, rather than to treat or provide any legitimate benefit to their patients.

**4.    The Fraudulent Charges for Trigger Point Injections**

180.    Pursuant to their fraudulent billing and treatment protocol, illegal kickback and financial arrangements, and referral scheme, the Management Defendants, the Clarke Billing Providers, and Clarke caused bills to be submitted through the Clarke Billing Providers to GEICO for medically useless trigger point injections.

181.    The sole purpose of these medically unnecessary injections was to enrich the Defendants as the injections were performed regardless of the Insureds' symptoms or complaints.

182.    The Management Defendants, the Clarke Billing Providers, and Clarke then billed the trigger point injections to GEICO through the Clarke Billing Providers under CPT code 20552, generally resulting in charges of $118.14 for each round of trigger point injections that they purported to provide.

183.    All of the billing submitted to GEICO by the Management Defendants, the Clarke Billing Providers, and Clarke for the putative trigger point injections represented that Clarke performed each and every billed-for injection.

184.    Like the Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were performed – to the extent they were performed at all – pursuant to illegal kickbacks and the fraudulent treatment protocol established by the Defendants.

   **a.    Legitimate Use of Trigger Point Injections**

185.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

186.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

187.    Any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

188.    In a legitimate trigger point treatment, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

189.    In a legitimate trigger point treatment, trigger point injections should not be administered more than once every two months, or more than six times in any given year. This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; and (ii) if a patient's pain is not relieved through the injections, the pain may be caused by something other than a trigger point, and the perpetuating factors of the pain must be identified and managed.

**b.    The Defendants' Medically Unnecessary Trigger Point Injections Under Ultrasound Guidance**

190.    The Management Defendants, the Clarke Billing Providers, and Clarke typically did not wait until any Insured failed conservative therapies before purporting to provide trigger point injections, because conservative therapy is not sufficiently remunerative.

191.    Instead, the Management Defendants, the Clarke Billing Providers, and Clarke frequently purported to provide trigger point injections to Insureds within the first week or two – and often within days – after the Insureds' automobile accidents, before the Insureds could have had pain symptoms that persisted for more than three months and before the Insureds could have failed or been intolerant of conservative therapies for at least one month. For instance:

(i)    On April 13, 2016, an Insured named AC was involved in an automobile accident. That same day, the Defendants purported to provide a trigger point injection to AC, which they billed to GEICO through Clarke PC, despite the fact that AC could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(ii)    On May 11, 2016, an Insured named CG was involved in an automobile accident. That same day, the Defendants purported to provide a trigger point injection to CG, which they billed to GEICO through Clarke PC, despite the fact that CG could not

have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(iii)    On August 10, 2016, an Insured named EJ was involved in an automobile accident. Just two days later, on August 12, 2016, the Defendants purported to provide a trigger point injection to EJ, which they billed to GEICO through the Clarke Practice, despite the fact that EJ could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(iv)    On August 11, 2016, an Insured named SH was involved in an automobile accident. Less than two weeks later, on August 24, 2016, the Defendants purported to provide a trigger point injection to SH, which they billed to GEICO through the Clarke Practice, despite the fact that SH could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy;

(v)    On September 2, 2016, an Insured named LG was involved in an automobile accident. That same day, the Defendants purported to provide a trigger point injection to LG, which they billed to GEICO through the Clarke Practice, despite the fact that LG could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(vi)    On January 1, 2017, an Insured named KJ was involved in an automobile accident. Less than three weeks later, on January 18, 2017, the Defendants purported to provide a trigger point injection to KJ, which they billed to GEICO through the Clarke Practice, despite the fact that KJ could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(vii)    On May 16, 2017, an Insured named HR was involved in an automobile accident. Just one week later, on May 23, 2017, the Defendants purported to provide a trigger point injection to HR, which they billed to GEICO through Clarke PC, despite the fact that HR could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(viii)    On June 22, 2017, an Insured named SY was involved in an automobile accident. Just one week later, on June 29, 2017, the Defendants purported to provide a trigger point injection to SY, which they billed to GEICO through Clarke PC, despite the fact that SY could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(ix)    On January 10, 2018, an Insured named MB was involved in an automobile accident. Less than one week later, on January 16, 2018, the Defendants purported to provide a trigger point injection to MB, which they billed to GEICO through the Clarke Practice despite the fact that MB could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(x)     On January 1, 2020, an Insured named HC was involved in an automobile accident. Just eight days later, on January 9, 2020, the Defendants purported to provide a trigger point injection to HC, which they billed to GEICO through the Clarke Practice, despite the fact that HC could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(xi)    On September 19, 2020, an Insured named SL was involved in an automobile accident. Just five days later, on September 24, 2020, the Defendants purported to provide a trigger point injection to SL, which they billed to GEICO the Clarke Practice, despite the fact that SL could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(xii)   On September 20, 2020, an Insured named GA was involved in an automobile accident. Just two days later, on September 22, 2020, the Defendants purported to provide a trigger point injection to GA, which they billed to GEICO through the Clarke Practice, despite the fact that GA could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(xiii)  On June 3, 2021, an Insured named JM was involved in an automobile accident. Just four days later, on June 7, 2021, the Defendants purported to provide a trigger point injection to JM, which they billed to GEICO through the Clarke Practice, despite the fact that JM could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

(xiv)   On September 29, 2021, an Insured named VG was involved in an automobile accident. Just nine days later, on October 8, 2021, the Defendants purported to provide a trigger point injection to VG, which they billed to GEICO through the Clarke Practice, despite the fact that VG could not have – by that point – experienced "persistent" pain symptoms or a failed course of conservative therapy.

192.    These are only representative examples.

193.    In the claims for trigger point injections identified in Exhibits "1" and "2", the Clarke Billing Providers and Clarke routinely purported to provide trigger point injections to Insureds within the first week or two – and often within days – after the Insureds' automobile accidents, before the Insureds could have had pain symptoms that persisted for more than three months and before the Insureds could have failed or been intolerant of conservative therapies for at least one month.

194.    Moreover, to further increase the amount of fraudulent billing they could submit to GEICO and other insurers, the Management Defendants, the Clarke Billing Providers, and Clarke routinely submitted a separate charge of $289.20, under CPT code 76942, for supposed "ultrasound guidance" used in the provision of the medically unnecessary trigger point injections.

195.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Management Defendants, the Clarke Billing Providers, and Clarke's billing rather than to treat the Insureds who supposedly were subjected to it.

196.    In fact, in a legitimate clinical setting, trigger point injections may be provided in an office setting, and do not require the use of ultrasound guidance.

197.    In fact, there is virtually no supportive scientific evidence for the use of ultrasound guidance in conjunction with routine in-office trigger point injections.

198.    Even so, in order to maximize the amount of billing they could cause to be submitted to GEICO, the Management Defendants, the Clarke Billing Providers, and Clarke virtually always purported to provide trigger point injections using ultrasound guidance.

**D.    The Fraudulent Billing for Independent Contractor Services**

199.    The Management Defendants, the Clarke Billing Providers, and Clarke's fraudulent scheme also included the submission of claims to GEICO on behalf of the Clarke Billing Providers seeking payment for services provided by independent contractors.

200.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors

– the healthcare services must be provided by the professional corporations, themselves, or by their employees.

201.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

202.    The healthcare professionals and/or technicians working on behalf of the Clarke Billing Providers set their own work schedules or had their schedules set for them by the Management Defendants.

203.    The healthcare professionals and/or technicians working on behalf of the Clarke Billing Providers worked without any supervision by Clarke.

204. The healthcare professionals and/or technicians working on behalf of the Clarke Billing Providers did not exclusively provide services for the Clarke Billing Providers.

205. To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare services providers were performed by healthcare professionals and/or technicians whom the Management Defendants, the Clarke Billing Providers, and Clarke treated as independent contractors.

206. For instance, the Management Defendants, the Clarke Billing Providers, and Clarke:

(i) paid the health care professionals and/or technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii) established an understanding with the health care professionals and/or technicians that they were independent contractors, rather than employees;

(iii) paid no employee benefits to the health care professionals and/or technicians;

(iv) failed to secure and maintain W-4 or I-9 forms for the health care professionals and/or technicians;

(v) failed to withhold federal, state, or city taxes on behalf of the health care professionals and/or technicians;

(vi) compelled the health care professionals to pay for their own malpractice insurance at their own expense;

(vii) permitted the health care professionals and/or technicians to set their own schedules and days on which they desired to perform services;

(viii) permitted the health care professionals and/or technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices; and

(ix) failed to cover the health care professionals and/or technicians for either unemployment or workers' compensation benefits; and

(x) "filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941 and New York State NYS-45 WEB Forms) that did not report: (a) all of the monies they paid for the services of the healthcare professionals and/or technicians; and/or (b) the identity of each healthcare professional and/or technician

who performed the Fraudulent Services, to the extent Defendants included a list of "employees" with their filings.

207.    By electing to treat the healthcare professionals as independent contractors, the Management Defendants, the Clarke Billing Providers, and Clarke realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the health care professionals.

208.    The Defendants were aware that, in order for them to receive reimbursement from GEICO and other no-fault insurers for the Fraudulent Services, those services needed to be, among other things, performed by employees of the Clarke Billing Providers, not by independent contractors.

209.    However, the Defendants wanted to realize, among other things, all of the financial benefits outlined above.

210.    Therefore, in furtherance of their fraudulent scheme, the Defendants misrepresented the identity of the individuals performing the Fraudulent Services.

211.    All of the billing submitted by the Defendants through the Clarke Billing Providers to GEICO represented that Clarke performed the billed-for services on behalf of the Clarke Billing Providers.

212.    In reality, many of the Fraudulent Services were performed – to the extent they were performed at all – by independent contractors.

213.    In keeping with the fact that Clarke did not performed all of the Fraudulent Services on behalf of the Clarke Billing Providers, the Management Defendants, Clarke, and the Clarke Billing Providers often falsely represented that Clarke had performed an impossible amount of purported healthcare services for GEICO Insureds on individual dates, often at multiple different No-Fault Clinics.

214.    For example:

(i)     The Management Defendants, Clarke, and Clarke PC falsely represented that Clarke personally performed 73 separate "services" to 47 separate GEICO Insureds at five different No-Fault Clinic locations on a single day, June 7, 2018. Those services included, among other things, 22 trigger point injections and 27 patient examinations, all supposedly provided by Clarke in a single day, and resulted in charges of more than $11,000.00.

(ii)    The Management Defendants, Clarke, and Clarke PC falsely represented that Clarke personally performed 79 separate "services" to 42 separate GEICO Insureds at six different No-Fault Clinic locations on a single day, December 20, 2018. Those services included, among other things, 22 trigger point injections and 33 patient examinations, all supposedly provided by Clarke in a single day, and resulted in charges of more than $13,000.00.

(iii)   The Management Defendants, Clarke, and Clarke PC falsely represented that Clarke personally performed 36 separate "services" to 24 separate GEICO Insureds at four different No-Fault Clinic locations on a single day, June 24, 2019. Those services included, among other things, eight trigger point injections and 20 patient examinations, all supposedly provided by Clarke in a single day, and resulted in charges of more than $6,500.00.

(iv)    The Management Defendants, Clarke, and Clarke PC falsely represented that Clarke personally performed 47 separate "services" to 26 separate GEICO Insureds at five different No-Fault Clinic locations on a single day, September 15, 2020.

Those services included, among other things, 11 trigger point injections and 19 patient examinations, all supposedly provided by Clarke in a single day, and resulted in charges of more than $9,300.00.

(v)    The Management Defendants, Clarke, and Clarke PC falsely represented that Clarke personally performed 41 separate "services" to 21 separate GEICO Insureds on a single day, July 7, 2021. Those services included, among other things, 12 trigger point injections and 13 patient examinations, all supposedly provided by Clarke in a single day, and resulted in charges of more than $7,200.00.

215.    These are only representative examples.

216.    In the claims identified in Exhibits "1" and "2", the Defendants routinely falsely represented that the Fraudulent Services were performed by Clarke when in fact, many of the Fraudulent Services were performed – to the extent they were performed at all – by independent contractors.

217.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services when, in fact, GEICO was not.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

218.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Clarke Billing Providers to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

219.    The HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)    The HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds.

(ii)     The HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    The HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)    The HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants fraudulently concealed that the Fraudulent Services were performed – to the extent performed at all – by independent contractors rather than employees of the Clarke Billing Providers.

(v)     The HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the Clarke Billing Providers were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the Clarke Billing Providers were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed.

## IV.    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

220.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

221.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

222.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Clarke Billing Providers in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

223.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

224.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

225.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

226.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

227.    In addition, the Defendants sought to conceal the Clarke Billing Providers' relationship to the fraudulent scheme by misrepresenting that Clarke was the owner of the Clarke Billing Providers when, in fact, the Clarke Billing Providers is owned, operated, and/or controlled by the Management Defendants.

228.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $3,000,000.00 based upon the fraudulent charges.

229.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Clarke and Clarke PC**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

230.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

231.    There is an actual case in controversy between GEICO and the Clarke Billing Providers regarding at least $1,000,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

232.    The Clarke Billing Providers have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

233.    The Clarke Billing Providers have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services – to the extent that they were provided at all – misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

234.    The Clarke Billing Providers have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services.

235.    The Clarke Billing Providers have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback payments made in exchange for patient referrals.

236.    The Clarke Billing Providers have no right to receive payments for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – by independent contractors rather than employees of the Clarke Billing Providers.

237.    The Clarke Billing Providers have no right to receive payments for any pending bills submitted to GEICO because the Clarke Billing Providers were fraudulently owned, operated, and/or controlled by unlicensed laypersons.

238.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that The Clarke Billing Providers have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against the Clarke and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

239.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

240.    Clarke, the Clarke Billing Providers, the Management Defendants, and John Doe Defendants "6"-"10" together constitute an association-in-fact "enterprise" (the "Clarke Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Clarke Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out

and facilitate its common purpose. Specifically, the Clarke Billing Providers were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO. The Clarke Fraud Enterprise has been operated through a series of corporations and through Clarke's personal tax identification number in order to facilitate the unlawful ownership and control over the Clarke Billing Providers by the Management Defendants. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Clarke Fraud Enterprise acting singly or without the aid of each other.

241.    The Clarke Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

242.    Clarke and the Management Defendants have been employed by and/or associated with the Clarke Fraud Enterprise.

243.    Clarke and the Management Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Clarke Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted

thousands of fraudulent charges on a continuous basis for over five years seeking payments that The Clarke Billing Providers were not eligible to receive because: (i) the Clarke Billing Providers were fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Clarke Billing Providers obtained its patients through the Defendants' illegal kickback scheme; and (vi) the billed-for-services were performed, to the extent they were provided at all, by independent contractors rather than the Clarke Billing Providers' employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2".

244.    The Clarke Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which the Nominal Owner Defendants and the Management Defendants operated the Clarke Fraud Enterprise, insofar as the enterprise is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through The Clarke Billing Providers to the present day.

245.     The Clarke Fraud Enterprise is engaged in in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Clarke Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

246.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000,000.00 pursuant to the fraudulent bills submitted through the Clarke Billing Providers.

247.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Clarke, the Management Defendants, and John Doe Defendants "6" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

248.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

249.     Clarke, the Management Defendants, and John Doe Defendants "6"-"10" are employed by and/or associated with the Clarke Fraud Enterprise.

250.     Clarke, the Management Defendants, and John Doe Defendants "6"-"10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Clarke Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that The Clarke Billing

Providers were not eligible to receive because: (i) the Clarke Billing Providers were fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons; (ii) the billed-for-services were not medically necessary; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Clarke Billing Providers obtained its patients through the Defendants' illegal kickback scheme; and (vi) the billed-for-services were performed, to the extent they were provided at all, by independent contractors rather than the Clarke Billing Providers' employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" and "2".

251.    Clarke, the Management Defendants, and John Doe Defendants "6"-"10" knew of, agreed to, and acted in furtherance of the common overall objective of the Clarke Fraud Enterprise (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

252.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000,000.00 pursuant to the fraudulent bills submitted through the Clarke Billing Providers.

253.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Clarke and the Management Defendants
### (Common Law Fraud)

254.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

255.    Clarke and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills through the Clarke Practice seeking payment for the Fraudulent Services.

256.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Clarke Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that the Clarke Practice was fraudulently incorporated and/or unlawfully owned, operated, and/or controlled by unlicensed laypersons; (ii) in every claim, the representation that the Clarke Practice was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) in every claim, the

representation that the billed-for services were performed by Clarke when in fact they were performed, to the extent they were performed at all, by independent contractors.

257.     Clarke and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Clarke Practice that were not compensable under the No-Fault Laws.

258.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000,000.00 pursuant to the fraudulent bills submitted by Clarke and the Management Defendants through the Clarke Practice.

259.     Clarke and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

260.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Clarke, the Management Defendants, and John Doe Defendants "6"-"10"**
**(Unjust Enrichment)**

261.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

262.     As set forth above, Clarke, the Management Defendants, and John Doe Defendants "6" – "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

263.    When GEICO paid the bills and charges submitted by or on behalf of the Clarke Practice for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Clarke, the Management Defendants, and John Doe Defendants "6" – "10".

264.    Clarke, the Management Defendants, and John Doe Defendants "6" – "10" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Clarke, the Management Defendants, and John Doe Defendants "6" – "10" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

265.    The retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

266.    By reason of the above, Clarke, the Management Defendants, and John Doe Defendants "6" – "10" have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,000,000.00.

**SIXTH CAUSE OF ACTION**
**Against Clarke, Clarke PC, and the Management Defendants**
**(Common Law Fraud)**

267.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

268.    Clarke, Clarke PC, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

269.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Clarke PC was properly licensed, and

therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that Clarke PC was fraudulently incorporated and/or unlawfully owned, operated, and/or controlled by unlicensed laypersons; (ii) in every claim, the representation that Clarke PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) in every claim, the representation that the billed-for services were performed by Clarke when in fact they were performed, to the extent they were performed at all, by independent contractors.

270.   Clarke, Clarke PC, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Clarke PC that were not compensable under the No-Fault Laws.

271.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $14,000.00 pursuant to the fraudulent bills submitted by Clarke, Clarke PC, and the Management Defendants through Clarke PC.

272.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

273.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Clarke, Clarke PC, the Management Defendants,**
**and John Doe Defendants "6"-"10"**
**(Unjust Enrichment)**

274.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

275.    As set forth above, Clarke, Clarke PC, the Management Defendants, and John Doe Defendants "6" – "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

276.    When GEICO paid the bills and charges submitted by or on behalf of Clarke PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Clarke, Clarke PC, the Management Defendants, and John Doe Defendants "6" – "10".

277.    Clarke, Clarke PC, the Management Defendants, and John Doe Defendants "6" – "10" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Clarke, Clarke PC, the Management Defendants, and John Doe Defendants "6" – "10" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

278.    The retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

279.    By reason of the above, Clarke, Clarke PC, the Management Defendants, and John Doe Defendants "6" – "10" have been unjustly enriched in an amount to be determined at trial, but in no event less than $14,000.00.

## JURY DEMAND

280.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Clarke and Clarke PC, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Clarke Billing Providers have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Clarke and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Clarke, the Management Defendants, and John Doe Defendants "6" – "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Clarke and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $3,000,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against the Clarke, the Management Defendants, and John Doe Defendants "6" – "10", more than $3,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.    On the Sixth Cause of Action against Clarke, Clarke PC, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $14,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

G.    On the Fifth Cause of Action against the Clarke, Clarke PC, the Management Defendants, and John Doe Defendants "6" – "10", more than 14,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: June 21, 2023

RIVKIN RADLER LLP


By:____/s/ *Barry I. Levy*_____
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Steven T. Henesy, Esq.
926 RXR Plaza
Uniondale, New York 11556
 (516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*